Filed 4/27/22  P. v. Blackmon CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>TED BLACKMON,<br><br>    Defendant and Appellant. | F082196<br><br>(Kern Super. Ct. No. BF113213A)<br><br><br>**OPINION** |

### THE COURT[*]

APPEAL from a judgment of the Superior Court of Kern County.  Michael G. Bush, Judge.

Steven A. Torres, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the Attorney General, Sacramento, California, for Plaintiff and Respondent.

-ooOoo-

---

[*] Before Hill, P. J., Levy, J. and Detjen, J.

## INTRODUCTION

In 2007, appellant Ted Blackmon was convicted after a jury trial of the first degree premeditated murder of Damon Moore, with the special circumstance that the murder was intentional, committed while he was an active participant in a criminal street gang, and it was carried out to further the activities of the gang. He was also convicted of the attempted premeditated murder of Kathy Crump. The prosecution's theory was that Blackmon intentionally killed Moore because the victim happened to be wearing a shirt in the color claimed by a rival gang. Blackmon was sentenced to life in prison without the possibility of parole.

In 2019, Blackmon filed a petition for resentencing pursuant to Penal Code[1] section 1170.95 and asserted that he was convicted of murder and attempted murder based on the felony-murder rule and/or the natural and probable consequences doctrine, he was not the actual killer because there was evidence that someone else could have been the gunman, and his conviction must be reversed because of the amendments to section 188 and 189. The superior court denied the petition.

On appeal, Blackmon's appellate counsel has filed a brief which summarizes the facts with citations to the record, raises no issues, and asks this court to independently review the record. (*People v. Wende* (1979) 25 Cal.3d 436.) Blackmon has filed a supplemental brief. We affirm.

## FACTS[2]

In July 2005, business partners Mark Young and Damon Moore, their employee Kathy Crump, and her boyfriend, Bural Trevan Wilkins, were traveling from Sacramento

---

[1] All further statutory citations are to the Penal Code unless otherwise indicated.

[2] Our factual summary is taken from this court's nonpublished opinion that affirmed Blackmon's convictions on direct appeal. (*People v. Blackmon* (Nov. 18, 2008, F052535).) The parties stated these facts in their briefing before the superior court, and Blackmon did so again on appeal. We recite these facts to provide context for the court's ruling and the parties' arguments. As will be explained below, we do not rely on this

2.

to Las Vegas in a rented midsized sports utility vehicle (SUV).  They were making the trip to celebrate Moore's impending marriage.  Young was driving and Moore had fallen asleep in the front passenger seat; Crump and Wilkins were passengers in the back seat.

Early the morning of July 15, 2005, Young exited the highway in Bakersfield to get gasoline and coffee; he and pulled into a gasoline station that shared space with a fast-food restaurant.  The station was well-lit and there were lots of people around.  Young parked the SUV at a gasoline pump with the driver's side closest to the pump and went into the station to pay for the gasoline.  Crump and Wilkins got out, went to the back of the SUV and lifted up the hatch; Wilkins was going through the luggage to find flipflops he wanted to change into, and Crump was showing Wilkins what she had packed for him.  When she got out of the SUV, Crump left the right rear passenger door wide open.

Moore was asleep inside the SUV.  Young returned to the SUV.  While he was standing by the SUV, Young noticed a Black man walking toward the vehicle.  Young looked over the SUV's hood and got a one-second glance at the man's face and upper body.  Young thought the man's eyes looked odd; they were kind of "glossy," as if he were on drugs.  This was the only time Young saw the man's face.  The man continued walking while Young turned his attention back to pumping gas.[3]

Crump, who was still standing with Wilkins at the back of the SUV, also noticed the man walking across the gasoline station's lot.  The man did not appear to be coming from a vehicle or going towards the station's store.  Crump noticed him because he was dressed "totally different" than everyone else at the station, and she thought he was cute.

---

factual summary in resolving the issues presented in this appeal.  (See § 1170.95, subd. (d)(3).)

[3] A trial, Young, who is six feet two inches tall, described the man as shorter than him, maybe five feet eight inches to five feet 10 inches tall, 160 pounds or less, with one eyelid "kind of shut" and "kinda lower than the other."  Young also described the man as having a medium complexion and a small mustache, and testified he was not wearing a hat or glasses.

At trial, Crump described him as being "clean-cut," meaning he was neat; he had on a nice shirt, which she described as a blue short-sleeve, button-up shirt with a pattern on it, and clean shoes, which she said were ankle-high hiking-type boots that were yellowish-orange in color. His shirt was untucked, and he had on long, blue jean shorts. The man was not wearing a hat. Crump did not remember if he had jewelry on, and although she could see his arms from right above the elbows down, she did not remember seeing any tattoos on his arms or body. He had a "fade" haircut, longer on the top and short in the back; Crump did not remember the man having any facial hair. Crump, who is five feet four inches tall, testified the man was a little taller than her.

The man walked past the SUV. Both Crump and Wilkins heard him say, "I see you, baby." Crump turned to look in his direction to see who he was talking to and saw an older model tan car with a brown top passing by. It looked like the man and the person in the car, who was a Black male, were nodding their heads at each other. Crump saw two people inside the car and noticed the front passenger was a woman. Wilkins also looked in the direction of the voice after the man's statement, which was the first time he noticed him. Wilkins thought the man and the person in the car knew one another.

Crump turned her attention back to the SUV. Out of the corner of her eye, Crump saw the man walk past her toward the front of the SUV and the door she left open. Wilkins also saw the man walk towards the SUV with his right hand in his pocket. As he was walking, the man glanced briefly over at Wilkins, who was able to see his whole face. Wilkins had a clear view of the man as he walked toward him. At trial, Wilkins estimated the man's height as the same as his, five feet six inches, and described him as wearing a loose, short-sleeve dark blue, gray and white striped, button-down shirt that was not tucked in, blue jean shorts that fell below his knees, and white tennis shoes. He did not have anything covering his head, and Wilkins did not see any jewelry or tattoos.

4.

Wilkins testified the man was clean-shaven, with the exception of a lightly shaved, thin mustache, and his hair was very short, like a taper cut.

**The Shootings**

As Wilkins and Crump watched, the man walked up to the SUV's door that Crump had left open, pulled out a handgun, which Crump and Wilkins believed to be a revolver, and shot Moore in the head.

Crump was standing at the back of the SUV, with the hatch open; she was looking around the back of the SUV at the man as he pulled the gun from his pocket and looked directly at him as he shot Moore. Wilkins saw the man point the gun at Moore; the SUV did not obstruct his view.

After the shot was fired, Crump froze, and Wilkins ran toward the restaurant to get help. The man turned towards Crump and fired a shot at her that went past her as she felt what she believed to be gunpowder burn her right cheek. They were looking at one another, face to face, when the man fired the shot. This was the only time Crump saw the man's face; she was looking down the gun, which he was holding with only his right hand, into the man's eyes. Although the gun hid a portion of the man's right eye, Crump thought she "got a really good look at him." Crump fell to the ground on her knees. The man ran away.

Wilkins heard the second shot as he ran. A window at the station shattered. Wilkins turned and saw Crump down on the cement. Because he did not know whether Crump had been shot, he went back to the SUV.

Young dropped to the ground when he heard the shots fired. When he stood up, Young saw Moore's head tilted back and blood gushing out of his nose. Moore had been shot twice behind the right ear and, according to the pathologist who performed his autopsy, died within a few seconds of being shot. As there were no powder burns around the entrance wounds, the pathologist estimated the firearm's muzzle was at least 12 inches from Moore's head when the shots were fired.

Within seconds of the gunshots, on-duty Bakersfield Police Officers John Billdt and Nate Anderberg, who heard the gunshots while they were picking up food from the fast-food restaurant's drive-thru, drove into the gasoline station's lot to try to determine the gunfire's origin. Officer Billdt did not see any shooting victims in the area of the gas pumps. He made a radio broadcast that shots had been fired at the station, and the officers circled the area in search of a suspect without success. Officer Anderberg documented the time of the shooting as 0117 hours.

**Trial Identifications of Blackmon**

At trial, Young identified Blackmon as the man who walked up to the SUV just before Moore was shot, and testified he was 80 to 90 percent certain of the identification based on Blackmon's size. Crump and Wilkins also identified Blackmon at trial as the shooter; Crump testified Blackmon "look[ed] like the same person." The jury was shown a July 15, 2005, video recording from the gasoline station's security camera. Crump, Wilkins, Young and the shooter are visible on the recording, as is other information the witnesses described, including the tan and brown vehicle and the police car that was at the fast-food restaurant when the shooting occurred.

**The Police Investigation**

Bakersfield Police Officer Daniel McAfee responded to the dispatch regarding the shooting. Officer McAfee saw [the victim] in the SUV's front passenger seat bleeding from his head and nose. Officer McAfee noticed a man, later identified as Ricky Burns, standing just outside the crime scene tape. Officer McAfee spoke with Burns and made a report of this contact.

Bakersfield Police Officer Eric South also responded to the scene and spoke with Crump and Wilkins. Wilkins described the shooter as a Black male, in his 20's, five feet seven inches tall, wearing a light blue shirt and long blue jean shorts. The police took Crump, Wilkins and Young to look at a suspect, but he was a Hispanic male who did not resemble the shooter.

6.

Detective Daniel Stevenson, the lead investigator, had brief conversations with Crump, Wilkins and Young at the crime scene. The three witnesses were taken to the police station to be interviewed. After Detective Stevenson interviewed them, he asked Crump and Wilkins, but not Young, to help prepare composite likenesses of the shooter on a computer.[4] Crump said she would not mind doing that, but when Detective Stevenson told her she could clarify any of the facial features or anything else she saw with the lab technician, she responded "I didn't really look at his face that much." Detective Stevenson did not discuss with her when she saw the shooter's face or for how long, but it was evident to him from speaking with her that she had seen the shooter's face when he shot at her.

Wilkins and Crump worked separately with Bakersfield Police Department crime lab technician Rebecca Stokes to come up with a composite sketch of the person who shot Moore. The composites were pieced together using a computer composite sketch program which contains databases of facial features, including foreheads, chins, noses, mouths and eyes. Stokes explained to both Wilkins and Crump that while the program uses real features from real human beings, they had to understand it would not be an exact likeness of the perpetrator and they were trying to achieve a "close likeness" of what they remembered. In making choices for the composite sketch, Wilkins and Crump selected the same eyes and mouth. At trial, Crump described the right eye in the composite as being a droopy eye because the top of the lid above the eye sags.

---

[4] According to Detective Stevenson, Wilkins told him the suspect was a Black man in his early to mid-20's, five feet six inches tall, 150 to 155 pounds, with a fade haircut, i.e. shaved on the side with a little hair on the top. Wilkins said the man was "smooth shaved," maybe with a thin mustache. The man wore a button-down shirt, which was blue plaid with thin white stripes. Wilkins thought the man wore white tennis shoes, but he did not look that closely because he was focusing on the man's upper body. According to Detective Stevenson, Crump told her the suspect was "barely taller" than she was, maybe five feet six inches to five feet seven inches tall, with a short afro, wearing a very long and baggy baby blue button-up shirt, in his mid to late 20's or "maybe early thirties."

7.

Once Wilkins and Crump finished their composites, they each signed a form which indicated the composite was complete, they were satisfied with the result and the likeness was the closest they could come to what they were remembering. At trial, Wilkins testified the composite was "similar" to the shooter. Wilkins explained it "got the eyes right and that was about it. Everything else was so-so ... But not – it was just – everything was kind of pieced, but it wasn't – it was close as it can come at that time." On cross-examination, Wilkins stated that he "was working around the eyes, as close as I can get."

Detective Stevenson interviewed Ricky Burns on July 16, 2005. As a result of that interview, Stevenson put together a photographic lineup of six photographs, which included a picture of someone named Eric Bender in position six and e-mailed the lineup to the Sacramento County Sheriff's Department. That evening, Sacramento County Sheriff's Department Detective David Clegg showed the lineup to Crump and Wilkins separately at their Sacramento apartment. Crump viewed the lineup for about one minute and said, "I just can't be sure." Crump testified at trial that the eyes in one of the photos were close, but "there was other traits that didn't look right" and "it wasn't the guy." Wilkins viewed the lineup for approximately two minutes. According to Detective Clegg, Wilkins told him it was between photos two and six. Wilkins then covered up all other photos except two and six and said, "[T]he eyes look like number two," but he was not sure. At trial, Wilkins testified that number one had a similar hairline and number two's eyes were similar, but he did not see anyone in that group of pictures that he knew was the shooter.

On July 19, 2005, Detective Stevenson interviewed Eric Bender. Bender at first denied having a nickname or moniker, but he later said he once went by "E," although he no longer did. When shown a photograph of Ricky Burns, he stated he did not recognize the person in the photograph or the name.

8.

Bender, who was born in May 1978 and at the time of trial was 28 years old, testified that he was an East Side Crips gang member, but claimed he dropped the affiliation when he was 24 or 25 years old. At the time of Moore's shooting, Bender had a fade haircut and more than likely was clean-shaven. For many years Bender, who is five feet four and a half inches tall and weighs about 130 or 135 pounds, has been known as either "Little E" or "Lil E." Ellis Stafford, Bender's much taller half-brother, is called "Big E." From time to time, Bender has simply been called "E." When he was interviewed in July, Bender denied knowing Ricky Burns even after a photo of Burns was shown to him. He does, however, know Burns and addresses him by the nicknames "Big Guy," "Big Dude," or "Big Man." Bender testified at the time of the shooting he lived with his mother in an apartment on H Street in Bakersfield.

Blackmon's assigned parole officer, Jerry Walsh, saw him on July 15, 2005. Blackmon, whose date of birth is July 3, 1980, came into the parole office at 2:30 p.m. that day after Officer Walsh left a card at Blackmon's residence at 8:30 a.m. instructing him to report to Officer Walsh's office. Blackmon seemed a "little bit … 'tweaked,' " by which Officer Walsh meant he was a little nervous, upset and on edge, like he might be under the influence. Blackmon provided a urine sample, which Officer Walsh took because Blackmon had given an earlier positive test for cocaine. On July 26, 2005, Walsh took Blackmon into custody because the July 15 test came back positive for cocaine. As part of the booking process, the officer took a photograph of Blackmon.

**Pretrial Identification of Blackmon**

For reasons never articulated at trial, officers put together another photographic lineup of six pictures, which included the July 26, 2005, picture of Blackmon in position number six. Detective Stevenson showed the lineup to Crump and Wilkins individually on July 26, 2005. Crump viewed the lineup between one to three minutes before selecting Blackmon's photograph. Detective Stevenson asked Crump if she was sure, and she said she was. At trial, Crump testified that when looking at the photographs, she

9.

always looked at the eyes first, and she recognized the shooter "almost instantly" because the eyes were the same. While what drew her attention to the photograph was that his right eyebrow was lifted and right eye sagging a little on top, "the whole picture" looked familiar to her as the person had the same lips, nose, and shape of face as the shooter. Crump testified she was 98 percent sure this was the shooter.

According to Detective Stevenson, Wilkins looked at the photographs for a few minutes before selecting Blackmon's photograph. Wilkins testified at trial, however, that when he saw the lineup, he "went straight to the guy who did it" and immediately brought it to the detective's attention. Neither Crump nor Wilkins said anything about the person's eyes when they identified Blackmon's photograph. In a subsequent interview, Wilkins told Detective Stevenson that when he first saw the second lineup, he thought two of the photographs in the lineup, number one and number six, looked very similar and were actually of the same person but on different dates. Wilkins said, however, the person in number six was more similar to the person at the time of the shooting and was the person who committed the murder.

A private investigator came to Young's office in Sacramento in May 2006 and showed him six photographs in sequential lineup. When Young was shown the fourth photograph, which was of Blackmon, he said, "[T]here's something about the eye." After viewing the remaining two photographs, Young told the investigator, "[I]t has been so long and I don't want to identify the wrong person," and "[T]hese are just head shots. It would really help to see a full-body photo. As I remember, the guy was skinny and short." At trial, Young testified that one of the pictures stood out to him. When shown the same photographs at trial, Young selected the fourth photograph as the one that looked familiar to him.

On July 26, 2005, Detective Stevenson and other Bakersfield police officers searched Blackmon's mother's apartment on Cottonwood Road in Bakersfield. The

officers were looking for specific items of clothing, including a blue plaid shirt. Officers found a brown striped shirt, a pair of blue jean shorts, and white tennis shoes.

**The Gang Expert**

Bakersfield Police Sergeant Greg Jehle, a supervisor in the gang unit, testified as a gang expert. Bakersfield has roughly 2,000 Crips, split among three major gangs: the East Side Crips, the West Side Crips, and the Country Boy Crips. The gasoline station where Moore was killed is located in an area claimed by the East Side Crips. The street on the west side of the station is the boundary between the East and West Side Crips.

The Crips gangs originally wore three different shades of blue: baby or powder blue for the Country Boy Crips; navy blue for the East Side Crips; and turquoise blue for the West Side Crips. While these color codes were strict in the past, gang members are no longer as rigid in wearing particular colors because the gang law now recognizes that as a method of identifying gang participants. If a gang member is found hanging out in a rival gang's territory, it is likely a violent act will result. The rival gangs hate each other and are at war. Gang members retaliate for past shootings of their members.

In 1996, a highly respected member of the East Side Crips, Rodney Sorriell, who had been paralyzed in an earlier drive-by shooting, was killed when two gunmen wearing Halloween masks shot Sorriell and others who had been participating in a high stakes dice game. Sorriell went by the moniker "E-Double."

In Sergeant Jehle's opinion, Blackmon was an active member of the East Side Crips at the time of the murder. Blackmon claimed membership in the East Side Crips during a January 2000 arrest and an October 2000 field interview. In December 2000, he was arrested in a known East Side Crip stronghold. In June 2002, Blackmon was shot five times while standing in a known East Side Crip hangout. In February 2004, he was arrested and admitted his association with the gang, and in April 2004, he was arrested after discarding a revolver while fleeing from the police. Blackmon was in custody from April 17, 2004, until May 11, 2005. Blackmon has tattoos indicating his affiliation with

11.

the East Side Crips, including "Lakeview Gangsters" and "East Side 300 Blocc" tattoos. He also has a tattoo that is a tribute to Sorriell. Blackmon also had written three letters in which he identified himself with the moniker "E-Double" or "Mr. E-Double." In a recorded pretrial telephone call, Blackmon referred to himself as "E."

Sergeant Jehle testified Bender is a documented member of the East Side Crips. Sergeant Jehle believed Bender was an active member of the gang at the time of the Moore shooting. Bender's moniker is "Lil E." He does not have tattoos on his forearms, legs or face. Bender has an extensive criminal history, including the commission of crimes Sergeant Jehle believed were for the benefit of the East Side Crips.

In 2005, the Country Boy Crips and West Side Crips were in a truce with each other, but both remained at "war" with the East Side Crips, with the predominant rivalry being between the East Side and Country Boy Crips. When Moore was murdered, he was wearing a shirt that was the bright baby blue color claimed by the Country Boy Crips.

In Sergeant Jehle's opinion, Moore's murder, the attempted murder of Crump, and the possession of the firearm used to commit the crimes, were all committed for the benefit of the shooter's gang, and Moore died because of the color of his shirt.

**Interviews With Blackmon**

On July 27, 2005, Detective Stevenson interviewed Blackmon, who was in custody. Detective Stevenson told Blackmon he wanted to question him about a shooting that took place a week or so earlier at a gas station and advised Blackmon of the warnings pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436. Blackmon waived those rights and agreed to speak to the detective.

Blackmon said he knew nothing about the shooting other than seeing something about it either on television or in the newspaper. Detective Stevenson asked Blackmon whether he could account for his whereabouts on July 15, 2005, at about 1:00 a.m. Blackmon replied he was "here and there," by which he meant he was either at his

12.

grandmother's apartment or at the house of his girlfriend, Deva Thompson. Blackmon said he was always at one or the other of the two locations.

Blackmon initially denied using any moniker or nickname and specifically denied using the moniker "E-Dub." Blackmon later admitted he had taken the name "E-Double" after Sorriell's murder, but said he no longer went by that name and claimed the moniker was different than "E-Dub." Blackmon acknowledged he had been a gang member in the past, but stated he no longer associated with gang members and decided to leave the gang life after being shot.

Detective Stevenson showed Blackmon the composite picture prepared based on Wilkins's description of the gunman. Blackmon said he did not believe the sketch looked like him; Detective Stevenson disagreed. Blackmon said he always had some facial hair, but the sketch did not show any.

Detective Stevenson showed Blackmon a May 11, 2005, photograph that showed him with only a thin mustache. Blackmon also said he always wears a hat, and the composite did not show a hat. Blackmon pointed out that the suspect in the sketch had droopy eyes; Detective Stevenson responded that Blackmon's right eye was droopy. Blackmon responded, "Well, that might be true," but stated the left eye in the composite was droopy and his left eye was not. Detective Stevenson told Blackmon that witnesses had picked his picture out of a photographic lineup. Blackmon said they must have been mistaken, since "all black people look alike." Detective Stevenson told him that one of the witnesses was Black. Blackmon responded they still must have been mistaken because he was not involved. Blackmon said the person who did the shooting must have looked like him and that is why the witnesses were mistaken.

Detective Stevenson and Detective Joe Aldana interviewed Blackmon again on July 30, 2005. The interview was recorded and transcribed. A redacted version of the recorded interview was played for the jury and the jurors were given a transcription of the interview to help them follow the recording. During the interview, when shown a picture

13.

of Ricky Burns, Blackmon said he looked familiar, and it had been a while since he had last seen him but denied associating with him. Blackmon told them that the last time he had been in the vicinity of the fast-food restaurant, he was with Deva and there was a cop behind them. It was at night, but he could not remember the exact date, although he said it was probably the previous month. Blackmon said he had not been out long enough to think about doing anything like this and why would he do some "stupid shit like this" after only being out of the "joint" for two months. Blackmon claimed he was not running or hiding from anything, so he did not keep track of where he was 20 days ago or on any given date. Blackmon denied shooting people and asked why he would shoot someone he did not know. Blackmon told the detectives he was with Deva at 1:15 a.m. on July 15, or he was sleeping at home. When the detectives asked him where he was with Deva, he responded he knew "exactly where I was at."

Detective Aldana suggested Blackmon was "[g]etting back at the Country for E Double." Detective Stevenson also suggested Blackmon was not telling them where he was at the time of the shooting because the jail was in lockdown and "you can't get a hold of somebody and say hey, tell 'em I was with you." Finally, Blackmon told the detectives he was at his grandmother's home on Kentucky Street with his grandmother and his brother, Demetrius, at the time of the shooting.

Next, Blackmon told the detectives he got a room with somebody that day, but he could not remember where, and the cocaine he used made his mind "cloudy." Then he said, "I don't give a fuck about what Deva tryin' to set no motive so you guys can build a case on it ." Blackmon said he had no reason to shoot the victim because he "ain't even from out here, man," and asked why he would be at the fast-food restaurant at 1:00 in the morning. Blackmon told the detectives once again he was having trouble with his memory, and "I was either here or there." The next moment, he said, "Yeah, I believe I was at home, man. On fuckin' Kentucky. I believe I was at home. [¶] … I believe Deva did come get me, I believe she did come get me … that's what I believe.… I believe she

14.

did come get me but I can't remember it .…" Blackmon believed he saw Deva on the 15th, because he went to a shopping mall with her that day.

Detective Stevenson went to the mall and obtained surveillance videotapes that confirmed Blackmon was there on the morning of July 15, 2005.

**Defense Case**

Mitchell Eisen, Ph.D., testified for the defense as an expert on memory and suggestibility. Dr. Eisen's role was to describe the current state of science in that area, not to offer his opinion as to the accuracy of the witnesses' testimony.

Dr. Eisen pointed out that people can only recall events to which they have paid attention and the ability to pay attention is itself limited. Dr. Eisen described the basic findings of the scientific community for accurate identification in a photo lineup. First, no one in the array should stick out unduly from the other photos. Second, an identification made in a laboratory environment tends to be significantly more accurate if made within 10 to 12 seconds than an identification made after a longer survey of the photos. There is no correlation between the confidence a person expresses in an identification and the accuracy of the selection.

Bender, who was recalled as a witness, testified that while he was paroled at the H Street apartment, he actually lived with his girlfriend at an apartment on Real Road. On July 16, 2005, Bakersfield police seized a blue and white plaid short-sleeve shirt and jean shorts from the H Street apartment.

At trial, Bender testified he did not have any clothing at the H Street apartment, and he did not recognize the clothing that was seized. Bender claimed his brother, Stafford, lived at the H Street apartment and thought the clothing belonged to him. Counsel for the parties, however, stipulated that Stafford had been continuously incarcerated since August 25, 2003. At trial, Bender denied telling Detective Stevenson he lived at the H Street apartment and denied acknowledging the seized clothing belonged to him.

15.

When Detective Stevenson questioned Bender on July 19, 2005, Bender said he was living with his mother on H Street and did not deny the clothing was his, even after being told it would be tested for gunshot residue and blood. But in a second interview on September 13, 2005, after Bender was told gunshot residue was found on the shorts, Bender denied the clothes belonged to him and said he had not worn any clothes that were at his mother's house in over three years.

Firearms examiner Gregory Laskowski testified the shorts from the H Street apartment were examined for gunshot residue and a single particle of unburned smokeless gunpowder was found on them. Laskowski also examined two pillows for gunshot residue and found up to two smokeless gunpowder particles on one of the pillows. In Laskowski's opinion, the particle from the shorts and the particles from the pillow were probably from two different ammunition sources, as they were dissimilar. Laskowski could exclude the particles from being from the same cartridge and probably from the same class of cartridge of a particular manufacturer.

The 15-year-old daughter of Blackmon's girlfriend, Deva Thompson, testified that Blackmon wore a hat and jewelry every day. The jewelry included a watch, one or two thick gold necklaces, and a diamond earring. During July 2005, Blackmon was growing a beard, but it was cut short, and a mustache.

Ricky Burns testified he was at the gasoline station that night driving a tan car with a brown fin top. Burns had been drinking at two clubs in East Bakersfield and was on the way home with two young ladies he met that night. They went to the fast-food restaurant to get something to eat. While driving through the station's lot, Burns saw a person walking towards his car. He thought it was "my homie 'Lil E'," so he called out to him and said, "What's up, E?" Burns said he was "pretty buzzing." The person nodded in response to the greeting.

Burns drove through the station to place an order at the fast-food restaurant's drive thru. As he was about to order, Burns heard what sounded like about 12 gunshots. Burns

thought someone was shooting at him, so he "punched it through" the drive-thru lane and drove around by the gasoline pumps. Burns saw a highway patrol vehicle entering the station. Burns left the station, dropped the young ladies off, and returned to the gasoline station; he was gone for five to 10 minutes. Burns parked on the street and walked to the station to see whether "Lil E" had been shot.

Burns talked to police officers and later went to the police department, where Detective Stevenson interviewed him. During that interview, Burns identified a photograph of Bender as the person he saw there that night who he thought was "E." Burns testified at trial that the person he saw the night of the murder who he thought was "E" was short and skinny. The person had short hair, "like a fade," and was in his late 20's or early 30's. Burns thought the man was wearing a jacket and white t-shirt, and he may have been wearing a hat.

As a long-term Bakersfield resident, Burns knows both Blackmon and Bender. Burns explained that all Black people in Bakersfield know one another. Burns knows Blackmon as Teddy, and also calls him Teddy Bear, Teddy Love Bug, Ted, or "T." He has never known Blackmon to go by the name E-Double. Burns did not know how many times he had socialized with Blackmon, but estimated it was "a lot of times." The last time he saw Blackmon before the shooting was "probably at a party or something" within a year before the shooting. Burns testified he did not see Blackmon at the gasoline station just before the gunshots were fired; he thought he saw "Lil E." Burns also testified he told the detectives he was so drunk that night that he was not sure who he had seen, but he could tell them "for sure who I thought I'd seen," which was Bender.

The videotape of Burns's interview with Detective Stevenson on July 16, 2005, was played for the jury. Burns told Detective Stevenson when he pulled into the fast-food restaurant's parking lot, he saw a man wearing yellow shoes jaywalking to the gasoline station from the donut shop across the street. That was when he stopped and thought he saw "my boy 'E.' " Burns said, "What's up 'E'?" Burns described "E" as

17.

being short and wearing a "wife beater" under a short-sleeve button-up shirt that was open. Burns did not see his shoes. Burns did not know why "E" would have waved at him because "E" would not have recognized Burns's car, since Burns had not seen "E" in about three years.

Officer Daniel McAfee testified that he talked to Burns at the gasoline station the night of the murder, and Burns told him he saw an individual there he thought he recognized and believed his name was "E." Burns described the individual as between five feet five and five feet seven inches tall, of small stature, wearing blue jean shorts and a short-sleeve button-up shirt. Officer McAfee also talked to Wilkins on the scene and described Wilkins as being a short, Black male. Wilkins described the shooter as being in his mid-20's, five feet six inches tall, 150 pounds, and wearing a blue hat, a blue plaid, short-sleeve button down shirt, and white athletic shoes with red striping. Crump told Officer McAfee that the guy who shot her was Black, and she got a good look at him. Wilkins also told Officer McAfee he got a "real good look" at the shooter. Young only described the shooter to Officer McAfee as being a Black male.

## PROCEDURAL BACKGROUND[5]

On April 10, 2006, an information was filed in the Superior Court of Kern County charging Blackmon with count 1, first degree premeditated murder of Moore (§ 187, subd. (a); § 189), with the special circumstance that the murder was intentional and committed while he was an active participant in a criminal street gang and it was carried out to further the activities of the gang (§ 190.2, subd. (a)(22)), a gang enhancement

---

[5] The following procedural background is from the records of Blackmon's 2007 jury trial that were augmented to the instant appellate record, and this court's opinion and the appellate records from his first appeal, *People v. Blackmon*, *supra*, F052535, of which we have taken judicial notice without objection from the parties. (§ 1170.95, subd. (d)(3); Evid. Code, § 450, § 452, subd. (d), § 459; *In re W.R.* (2018) 22 Cal.App.5th 284, 286–287, fn. 2.)

18.

(§ 186.22, subd. (b)(1)), and an enhancement for the personal discharge of a firearm causing death (§ 12022.53, subd. (d)).

Blackmon was also charged with count 2, attempted premeditated murder of Kathy Crump (§§ 664, 187, subd. (a), § 189), with a gang enhancement and a personal discharge enhancement (§ 12022.53, subd. (c)); and counts 3, 4, and 5, felon in possession of a firearm (former § 12021, subd. (a)(1)), with gang enhancements.

It was further alleged Blackmon had one prior strike conviction, one prior serious felony enhancement (§ 667, subd. (a)), and two prior prison term enhancements (§ 667.5, subd. (b)).

On the prosecution's motion, the court dismissed counts 4 and 5, felon in possession of a firearm.

## Jury Instructions

At Blackmon's trial, the jury was instructed on first and second degree murder, premeditation and deliberation, express and implied malice, and attempted murder.

As to the special circumstance, the court gave the jury CALJIC Nos. 8.80.1 and 8.81.22, that if it found Blackmon guilty of first degree murder, it must determine whether the murder was "an intentional killing by an active street gang member" and whether Blackmon "intentionally killed the victim."

The jury was also instructed on evaluating eyewitness identification testimony.

The jury was not instructed on the aiding and abetting, principals and accomplices, the felony-murder rule, the natural and probable consequences doctrine, or any underlying felonies, target or nontarget offenses.

## Convictions and Sentence

On February 9, 2007, the jury convicted Blackmon of count 1, first degree premeditated murder with the gang special circumstance; count 2, attempted premeditated murder; and count 3, felon in possession of a firearm; and the gang and

firearm enhancements were found true. Blackmon admitted the prior conviction allegations.

On March 12, 2007, the court denied Blackmon's motion for new trial. As to count 1, first degree murder with the special circumstance, the court sentenced him to life in prison without possibility of parole, plus 25 years to life for the personal discharge enhancement, and consecutive terms of five years for the prior serious felony enhancement and one year for the prior prison term enhancement.

As to count 2, attempted premeditated murder, the court imposed 15 years to life, doubled to 30 years to life as the second strike term, plus 20 years for the firearm enhancement, five years for the prior serious felony enhancement, and one year for the prior prison term enhancement; and a consecutive term of eight months (one-third the midterm) for count 3, doubled to 16 months as the second strike term, plus determinate terms for the gang and prior conviction enhancements.

**Blackmon's Direct Appeal**

On November 18, 2008, this court filed the nonpublished opinion that affirmed Blackmon's convictions on direct appeal. (*People v. Blackmon*, *supra*, F052535.)

We rejected his argument that the People failed to prove he was the gunman, that there was insufficient evidence he was the person who shot the victims, and that the evidence instead showed Bender was the gunman.

> "All three witnesses testified that they saw the shooter's face. Young saw the shooter's face and upper body for at least a second as the shooter walked past the SUV. Wilkins saw the shooter's face when the shooter glanced over at him as he was walking toward the SUV's open door. Crump saw the shooter's face when he pointed the gun at her and fired. While as Blackmon points out Crump told Detective Stevenson that she didn't look at his face that much and she testified the gun hid a portion of the shooter's right eye, Detective Stevenson also testified that it was clear to him that she did get a look at his face when he shot at her and Crump told an officer at the scene that she got a good look at the shooter. That Wilkins and Crump selected the same eyes and mouth when coming

20.

up with their composite drawings of the shooter supports the jury's implicit finding that they both saw and remembered the shooter's face.

"Both Crump and Wilkins picked Blackmon as the shooter when Detective Stevenson showed them a photographic lineup on July 26. Notably, neither Crump nor Wilkins selected Bender's photograph as the shooter in the photographic lineup they were shown on July 16. While both Crump and Wilkins expressed uncertainty when viewing the first lineup, they explained at trial that there were features on one or two of the photographs that were similar to the shooter, but no one in the first lineup was the shooter. Although they both took a minute or more to identify Blackmon as the shooter in the second lineup, and Wilkins believed two of the photographs were of the same person, both Wilkins and Crump testified that the person in photograph number six, i.e., Blackmon, was the shooter.

"All three witnesses commented on an unusual feature of the shooter's eye. Parole Officer Walsh agreed Blackmon's right eyelid droops. Blackmon contends the witnesses' failure to mention the droopy eye before Blackmon was identified in the photographic lineup calls his identification into question. Crump testified, however, that the composite sketch showed the droopy right eye. When Detective Stevenson showed Blackmon the composite, Blackmon acknowledged the sketch showed droopy eyes, but claimed it showed both eyes as droopy while only his right eye was droopy. From this evidence, the jury reasonably could conclude that because the sketch shows the droopy eye, which both Wilkins and Crump selected, there was no need to specifically tell the police about the droopy eye. [¶]

"In addition to the eyewitness identifications, other evidence tied Blackmon to the shooting. Young testified the shooter's eyes looked 'glossy,' as if he were on drugs; Blackmon tested 'dirty' for drugs the day of the shooting. Blackmon is a verified and admitted member of the East Side Crips criminal street gang; he has gang tattoos and used the moniker 'E-Double.' Moore was wearing the color of Blackmon's rival gang, the Country Boy Crips, when he was shot and was in East Side Crips 'territory.' In his recorded interview, Blackmon told Detective Stevenson the last time he had been at the fast-food restaurant he saw police there. In addition, Blackmon was unable to offer a coherent or consistent explanation of where he was when the shooting occurred. During his first interview, he told police he was 'here and there' and eventually said he was either at his grandmother's apartment or girlfriend's house. At his recorded interview, he said alternatively he was at his grandmother's home with his brother, he got a room with somebody, he was with his girlfriend, and his mind was cloudy so he was not sure where he was that night.

21.

"Blackmon contends the evidence established Bender, not he, was the actual shooter, as Burns identified Bender as the person he saw at the gasoline station's lot prior to the shooting, Bender had the same motive to shoot Moore as Blackmon did since he was also an East Side Crips gang member, and the eyewitness identifications are more consistent with Bender's appearance. Burns's testimony, however, is less than credible. Burns admitted he was so drunk that night that he wasn't sure who he had seen, but he thought he saw Bender, and admitted at one point in his testimony that he did not know if the person he saw was Bender or Blackmon. It appears from the security videotape that the shooter was waving at Burns's car from quite a distance, since Burns's car enters the picture from the same direction the shooter is waving toward. In an interview with Detective Stevenson, Burns stated he did not know why the shooter was waving at him and he didn't know how Bender would know his car, since he hadn't seen Bender in about three years. The jury was free to reject his testimony; it is not our role to reevaluate the testimony and credibility of witnesses. (*People v. Koontz* [(2002) 27 Cal.4th 1041, 1078].)

"While Bender may have had features similar to the shooter's and the same motive for the murder, the eyewitnesses identified Blackmon as the shooter. The jury obviously found these witnesses to be credible. Blackmon's argument is, in essence, a request that we reweigh the evidence, which we cannot do. Instead[,] we conclude his identification as the shooter is supported by substantial evidence." (*People v. Blackmon*, *supra*, F052535, at pp. 20–23.)

This court also rejected Blackmon's claims of sentencing error, and ordered the minutes corrected to correspond to the court's oral pronouncement of judgment.

## SENATE BILL NOS. 1437 & 775

The instant appeal is from the denial of Blackmon's petition for resentencing that he filed pursuant to Senate Bill No. 1437 (2017–2018 Reg. Sess. (Senate Bill 1437)).

Senate Bill 1437 was effective on January 1, 2019, and amended " 'the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who

22.

acted with reckless indifference to human life.' " (*People v. Lewis* (2021) 11 Cal.5th 952, 959 (*Lewis*).)[6]

"Substantively, Senate Bill 1437 accomplishes this by amending section 188, which defines malice, and section 189, which defines the degrees of murder, and as now amended, addresses felony murder liability." (*People v. Martinez* (2019) 31 Cal.App.5th 719, 723; *People v. Gentile* (2020) 10 Cal.5th 830, 842.)

"In addition to substantively amending sections 188 and 189 of the Penal Code, Senate Bill 1437 added section 1170.95, which provides a procedure for convicted murderers who could not be convicted under the law as amended to retroactively seek relief." (*Lewis, supra*, 11 Cal.5th at p. 959.)

"Pursuant to section 1170.95, an offender must file a petition in the sentencing court averring that: '(1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine[;] [¶] (2) The petitioner was convicted of first degree or second degree murder following a trial or accepted a plea offer in lieu of a trial at which the petitioner could be convicted for first degree or second degree murder[;] [¶] [and] (3) The petitioner could not be convicted of first or second degree murder because of changes to section 188 or 189 made effective January 1, 2019.' [Citations.] Additionally, the petition shall state '[w]hether the petitioner requests the appointment of counsel.' [Citation.] If a petition fails to comply with subdivision (b)(1), 'the court may deny the petition without prejudice to the filing of another petition.' " (*Lewis, supra*, 11 Cal.5th at pp. 959–960.)

---

[6] As amended, section 189, subdivision (f) states an exception that allows "individuals to be convicted of felony murder even if they did not act with malice and do not fall in one of the three categories of section 189, subdivision (e), where the victim is a peace officer engaged in the course of his or her duties and the defendant knows (or reasonably should know) these facts." (*People v. Hernandez* (2021) 60 Cal.App.5th 94, 99.)

23.

"Where the petition complies with section 1170.95, subdivision (b)'s three requirements, then the court proceeds to subdivision (c) to assess whether the petitioner has made 'a prima facie showing' for relief. [Citation.] [¶] If the trial court determines that a prima facie showing for relief has been made, the trial court issues an order to show cause, and then must hold a hearing 'to determine whether to vacate the murder conviction and to recall the sentence and resentence the petitioner on any remaining counts in the same manner as if the petitioner had not … previously been sentenced, provided that the new sentence, if any, is not greater than the initial sentence.' [Citation.] 'The prosecutor and the petitioner may rely on the record of conviction or offer new or additional evidence to meet their respective burdens.' [Citation.] At the hearing stage, 'the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing.' " (*Lewis, supra*, 11 Cal.5th at p. 960.)

**Lewis**

In *Lewis*, the court interpreted the provisions of section 1170.95 and held that petitioners "are entitled to the appointment of counsel upon the filing of a facially sufficient petition [citation] and that only *after* the appointment of counsel and the opportunity for briefing may the superior court consider the record of conviction to determine whether 'the petitioner makes a prima facie showing that he or she is entitled to relief.' " (*Lewis, supra*, 11 Cal.5th at p. 957.) " 'If the petitioner has requested counsel, the court *shall* appoint counsel to represent the petitioner.' " (*Id*. at p. 963, italics added in original.)

*Lewis* also held that "at the prima facie stage, a petitioner's allegations should be accepted as true, and the court should not make credibility determinations or engage in 'factfinding involving the weighing of evidence or the exercise of discretion.' " (*Lewis, supra,* 11 Cal.5th at p. 974.) When the court conducts the prima facie determination, section 1170.95, subdivision (b)(2) only permits screening out "noncomplying petitions, not petitions that lack substantive merit." (*Lewis,* at p. 968.)

24.

*Lewis* further held that after appointing counsel, the trial court may rely on the record of conviction to determine whether the prima facie showing has been made in order "to distinguish petitions with potential merit from those that are clearly meritless." (*Lewis, supra*, 11 Cal.5th at p. 971.) "While the trial court may look at the record of conviction after the appointment of counsel to determine whether a petitioner has made a prima facie case for section 1170.95 relief, the prima facie inquiry under subdivision (c) is limited. Like the analogous prima facie inquiry in habeas corpus proceedings, ' "the court takes petitioner's factual allegations as true and makes a preliminary assessment regarding whether the petitioner would be entitled to relief if his or her factual allegations were proved. If so, the court must issue an order to show cause." ' " (*Lewis,* at p. 971.)

" 'However, if the record, *including the court's own documents*, "contain[s] facts refuting the allegations made in the petition," then "the court is justified in making a credibility determination adverse to the petitioner." ' " (*Lewis, supra*, 11 Cal.5th at p. 971, italics added.)

"Appellate opinions … are generally considered to be part of the record of conviction. [Citation.] However, as we cautioned in [*People v. Woodell* (1998) 17 Cal.4th 448, 457], the probative value of an appellate opinion is case specific, and 'it is certainly correct that an appellate opinion might not supply all answers.' [Citation.] In reviewing any part of the record of conviction at this preliminary juncture, a trial court should not engage in 'factfinding involving the weighing of evidence or the exercise of discretion.' [Citation.] As the People emphasize, the 'prima facie bar was intentionally and correctly set very low.' " (*Lewis, supra*, 11 Cal.5th at p. 972.)

"[T]here is no categorical bar to consulting the record of conviction at the prima facie stage." (*Lewis, supra*, 11 Cal.5th at p. 972, fn. 6.) "In sum, the parties can, and should, use the record of conviction to aid the trial court in reliably assessing whether a petitioner has made a prima facie case for relief under [section 1170.95,] subdivision (c)." (*Id.* at p. 972, fn. omitted.)

The prima facie determination is a question of law, and the court may deny a petition at the prima facie stage if the petitioner is ineligible for resentencing as a matter of law. (*Lewis, supra*, 11 Cal.5th at p. 966.)

*Lewis* announced a prejudicial error standard under *People v. Watson* (1956) 46 Cal.2d 818, if the court failed to appoint counsel or violated the petitioner's statutory rights under section 1170.95, and the petitioner must "therefore 'demonstrate there is a reasonable probability that in the absence of the error he [or she] … would have obtained a more favorable result.' " (*Lewis, supra*, 11 Cal.5th at p. 974.)

Therefore, to demonstrate prejudice from the denial of a section 1170.95 petition before the issuance of an order to show cause, the petitioner must show it is reasonably probable that, absent error, his or her petition would not have been summarily denied without an evidentiary hearing. (*Lewis, supra*, 11 Cal.5th at pp. 972–974; see *People v. Watson*, *supra*, 46 Cal.2d at p. 836.)

**Senate Bill No. 775**

In October 2021, Senate Bill No. 775 was enacted and amended section 1170.95, effective on January 1, 2022. (2020–2021 Reg. Sess.; Stats. 2021, ch. 551, § 1 (Senate Bill 775).) As a result of the amendments, section 1170.95 clarified that "persons convicted of felony murder or murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, attempted murder under the natural and probable consequences doctrine, or manslaughter," may file a petition to have that conviction vacated under certain circumstances. (§ 1170.95, subd. (a).)

The amendments also codified the holding in *Lewis* that "[u]pon receiving a petition in which the information required by this subdivision is set forth …, if the petitioner has requested counsel, the court shall appoint counsel to represent the petitioner." (§ 1170.95, subd. (b)(3).) After the petition is filed, the People shall file a response and the petitioner may serve a reply. (*Id*. at subd. (c).)

After the parties have the opportunity to submit briefs, "the court shall hold a hearing to determine whether the petitioner has made a prima facie case for relief." (§ 1170.95, subd. (c).) If the petitioner makes the prima facie showing, "the court shall issue an order to show cause." (*Ibid*.) If the court declines to issue an order to show cause, "it shall provide a statement fully setting forth its reasons for doing so." (*Ibid*.)

If an order to show cause is issued, "the court shall hold a hearing to determine" whether to vacate the petitioner's conviction, recall the sentence, and resentence petitioner. (§ 1170.95, subd. (d)(1).) At the hearing, the prosecution has the burden to prove beyond a reasonable doubt that petitioner is guilty of murder or attempted murder under the amended versions of sections 188 and 189. (§ 1170.95, subd. (d)(3).)

"At the hearing to determine whether the petitioner is entitled to relief … [t]he admission of evidence in the hearing shall be governed by the Evidence Code, except that the court *may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed. The court may also consider the procedural history of the case recited in any prior appellate opinion*. However, hearsay evidence that was admitted in a preliminary hearing pursuant to subdivision (b) of Section 872 shall be excluded from the hearing as hearsay, unless the evidence is admissible pursuant to another exception to the hearsay rule. The prosecutor and the petitioner may also offer new or additional evidence to meet their respective burdens. A finding that there is substantial evidence to support a conviction for murder … is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing." (§ 1170.95, subd. (d)(3), as amended by Stats. 2021, ch. 551, § 2, eff. Jan. 1, 2022, italics added.)

### BLACKMON'S SECTION 1170.95 PETITION

On November 20, 2019, Blackmon filed, in pro. per., a petition in the superior court for resentencing pursuant to section 1170.95 and requested appointment of counsel and an evidentiary hearing. Blackmon filed a supporting declaration stating he was

27.

convicted of murder and attempted murder based on the felony murder rule and the natural and probable consequences doctrine.

Blackmon separately raised several claims of alleged error that occurred at his jury trial, including the People's purported use of false evidence, ineffective assistance of his trial attorney, he was illegally arrested without a warrant, exculpatory evidence was excluded from trial, the identification evidence was false and unreliable, and his convictions were not supported by substantial evidence.

**The People's Opposition**

The court appointed counsel to represent Blackmon.

On February 6, 2020, the People filed opposition to the petition and recited the facts from this court's prior opinion. The People argued Blackmon was not entitled to relief under section 1170.95 because he was charged and convicted as the actual killer, he was not prosecuted under the felony-murder rule or the natural and probable consequences doctrine, and the gang special circumstance was found true, that he acted with intent to kill.[7]

**Blackmon's Reply**

On September 30, 2020, Blackmon's counsel filed a reply to the opposition that also relied on the facts from this court's prior opinion.

Blackmon argued he made a prima facie showing for relief under section 1170.95 because he was not the actual killer, citing the evidence introduced at trial that the gunman could have been Eric Bender, and questioning the reliability of the eyewitness identifications. Blackmon further argued the jury's true finding on the special circumstance did not make him statutorily ineligible for relief.

---

[7] On February 6, 2020, the prosecution filed a motion to dismiss the petition because Senate Bill No. 1437 was unconstitutional. On March 12, 2020, the court denied the prosecution's motion to dismiss.

28.

**The Court's Denial of the Petition**

On December 16, 2020, the court issued a minute order and denied the Blackmon's section 1170.95 petition without a hearing or stating reasons for not issuing an order to show cause.

On December 28, 2020, Blackmon filed a timely notice of appeal from the denial of his petition.

## DISCUSSION

As noted above, Blackmon's counsel has filed a *Wende* brief with this court. The brief also includes the declaration of appellate counsel indicating that Blackmon was advised he could file his own brief with this court. By letter on September 16, 2021, 2021, we invited him to submit additional briefing.

**Blackmon's Supplemental Brief**

On October 12, 2021, Blackmon filed a supplemental brief in pro. per., asserting that he was entitled to relief under section 1170.95 because he was convicted of murder and attempted murder based on the felony-murder rule and/or the natural and probable consequences doctrine.

Blackmon separately argued the superior court should hold an evidentiary hearing to address the alleged errors that occurred at his jury trial, including his claim that the prosecutor allegedly conspired with the police, and the court improperly excluded evidence about the photographic lineups.

**Blackmon's Allegations About the Jury Trial**

We first note that Blackmon cannot raise issues arising from his jury trial as the basis for his section 1170.95 petition. Section 1170.95 provides a mechanism for resentencing individuals whose convictions are no longer valid due to changes to sections 188 and 189. (§ 1170.95, subd. (a)(3).) It does not provide a mechanism for challenging a jury's prior factual findings. (*People v. Allison* (2020) 55 Cal.App.5th 449, 461.) "The purpose of section 1170.95 is to give defendants the benefit of

29.

amended sections 188 and 189 with respect to issues not previously determined, not to provide a do-over on factual disputes that have already been resolved." (*Ibid.*)

**The Record**

As to the merits of Blackmon's petition, we note that while the trial court appointed counsel and the parties fully briefed the matter, the court failed to comply with section 1170.95, subdivision (c) because it summarily denied the petition without conducting a hearing or giving a statement of reasons for not issuing an order to show cause. It is also unclear what materials the court relied on and what conclusions it drew in determining Blackmon was ineligible for resentencing, but the parties' briefs restated this court's factual statement from Blackmon's direct appeal.

The opinion in Blackmon's direct appeal is part of the record of conviction that the court may consider in determining whether petitioner has made a prima facie showing of resentencing eligibility. (*Lewis, supra*, 11 Cal.5th at p. 972.) However, the role of the appellate opinion is circumscribed. The factual summary contained in an appellate opinion is not considered admissible evidence regarding a petitioner's resentencing eligibility (§ 1170.95, subd. (d)(3)), and the court may not engage in factfinding based on the appellate opinion at the prima facie stage (*Lewis,* at p. 972).

The trial court erroneously denied Blackmon's petition without holding a hearing, issuing a statement of reasons when it declined to issue an order to show cause, and to the extent it engaged in premature factfinding at the prima facie state. (§ 1170.95, subd. (c).) If the trial court committed error by failing to comply with section 1170.95, we may affirm if petitioner was not prejudiced by the error. (*Lewis, supra*, 11 Cal.5th at pp. 972–974.)

**Prejudicial Error**

To demonstrate prejudice from the denial of a section 1170.95 petition before the issuance of an order to show cause, the petitioner must show it is reasonably probable that, absent the statutory errors, his or her petition would not have been summarily denied

without an evidentiary hearing. (*Lewis, supra*, 11 Cal.5th at pp. 972–974; *People v. Watson, supra,* 46 Cal.2d at p. 836.)

Pursuant to section 1170.95, a petitioner is ineligible for resentencing if he or she was the actual killer, acted with the intent to kill or malice aforethought, or was a major participant in the underlying felony who acted with reckless indifference to human life. (§§ 188, subd. (a)(3), 189, subd. (e), 1170.95, subd. (a)(3); see *People v. Gentile, supra*, 10 Cal.5th at p. 842.) The court may rely on jury instructions, which are part of the record of conviction, to make the prima facie determination because the instructions "given at a petitioner's trial may provide 'readily ascertainable facts from the record' that refute the petitioner's showing, and reliance on them to make the eligibility or entitlement determinations may not amount to 'factfinding involving the weighing of evidence or the exercise of discretion.' " (*People v. Soto* (2020) 51 Cal.App.5th 1043, 1055, disapproved on another ground in *Lewis*, *supra*, 11 Cal.5th 952.)

Blackmon was not prejudiced by the court's failure to comply with section 1170.95 because the record shows he was ineligible for relief as a matter of law. First, Blackmon was charged and convicted as the actual killer. The procedural records from Blackmon's trial show the jury was instructed on first and second degree murder, premeditation and deliberation, express and implied malice, and attempted murder. The jury was not instructed on aiding and abetting, principals and accomplices, the felony-murder rule, the natural and probable consequences doctrine, any underlying felonies, or target or nontarget offenses. He was also convicted of attempted premeditated murder as the actual shooter. He was not convicted as an aider or abettor, or under the felony-murder rule or the natural and probable consequences doctrine. (§ 1170.93, subd. (a)(3); *Lewis, supra,* 11 Cal.5th at p. 959 ["the Legislature passed Senate Bill 1437 'to amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who [inter alia] is not the actual killer' "].)

As a separate matter, Blackmon is also ineligible for relief under section 1170.95 because of the jury's true finding on the gang special circumstance under section 190.2, subdivision (a)(22), which imposes a sentence of death or life without the possibility of parole for a murder involving the defendant's active participation in a criminal street gang. To find that special circumstance true, the jury was required to find that Blackmon intended to kill the victim. (§ 190.2, subds. (a)(22), (c); *People v. Allison, supra,* 55 Cal.App.5th at pp. 460–461; accord, *People v. Fayed* (2020) 9 Cal.5th 147, 201–202 [considering murder for financial-gain special circumstance pursuant to § 190.2, subd. (a)(1)].) The jury was instructed that if it found Blackmon guilty of first degree murder, it must determine whether the murder was "an intentional killing by an active street gang member" and Blackmon "intentionally killed the victim." The true finding on the gang-related special circumstance therefore establishes the jury made the necessary finding so that his murder conviction continues to be valid under the law as amended by Senate Bill 1437 (2017–2018 Reg. Sess.).

We thus conclude Blackmon is ineligible for resentencing as a matter of law, and he was not prejudiced by the court's summary denial of his petition. (*Lewis, supra*, 11 Cal.5th at pp. 972–974.)

After independent review of the record, we find that no reasonably arguable factual or legal issues exist.

## **DISPOSITION**

The judgment is affirmed

32.